# In the United States District Court
## for the Southern District of Georgia
## Waycross Division

| | | |
|---|---|---|
| JOSEPH HARPER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CV 510-047 |
| | * | |
| CHRIS PERKINS; RODNEY COURSON; | * | |
| JEREMIAH DAVIS; and MATT GOURLEY | * | |
| | * | |
| Defendants. | * | |

## ORDER

Presently before the Court are Motions for Summary Judgment filed by Defendants Rodney Courson, Jeremiah Davis, Chris Perkins, and Matt Gourley. See Dkt. Nos. 67, 72. For the reasons stated below, Defendants' Motions are **GRANTED** in part and **DENIED** in part.

### BACKGROUND

On Memorial Day 2008, Defendant Officers Chris Perkins, Rodney Courson, Jeremiah Davis, and Matt Gourley were called to respond to a domestic call on Lobolly Avenue in Coffee County, Georgia. Dkt. No. 79, ¶ 1. Plaintiff Joseph Harper lived at a residence on Lobolly Avenue with his fiancée Mary Crimmins,

AO 72A
(Rev. 8/82)

Crimmins and Harper's two young children, Harper's nephew Brandon Singleton, and Singleton's wife. Dkt. No. 79, ¶ 2.

After a day of holiday festivities, Plaintiff and Crimmins had a heated argument which evolved into a physical altercation. During this altercation, 911 received a "hang up" phone call from Crimmins, where Crimmins called 911 but no information was conveyed. Dkt. No. 79, ¶¶ 22-24. Eventually, Singleton, who observed the altercation, called 911 and requested police assistance. Dkt. No. 79, ¶ 33-34.[1]

At approximately 10:25 p.m., the 911 dispatcher sent Officer Perkins to the scene. Dkt. No. 79, ¶ 35. The dispatcher told Officer Perkins that 911 had received a call at the residence because there was a man there with a "gun pointed at everybody." Dkt. No. 79, ¶ 37. The dispatcher also informed Officer Perkins that, although Crimmins and Crimmins's children had left the residence, there were still people in the residence and that the offender was "shootin' off" the gun. Dkt. No. 79, ¶ 44.

En route, Officer Perkins was flagged down by Crimmins, who had left the scene. Dkt. No. 79, ¶ 47. Officer Perkins saw "visible injuries" on Crimmins. Dkt. No. 79, ¶ 48. Crimmins

---

[1] Through the course of discovery, numerous details about the argument and the events leading up to the argument have been uncovered. See Dkt. No. 67, Ex. 1, ¶¶ 10-26. However, in light of the applicable legal standard, this description of the facts focuses on the information conveyed to Defendants prior to the tasing.

AO 72A
(Rev. 8/82)

informed Officer Perkins that Plaintiff "had been drinking pretty much all day and had been taking methadone." Dkt. No. 79, ¶ 49. After speaking with Crimmins, Officer Perkins continued onto the residence where he met Officer Courson. Dkt. No. 79, ¶ 51.

Officers Perkins and Courson talked to Singleton, who told them he heard "yelling and screaming" coming from another room. Dkt. No. 62, 57:1-25; Dkt. No. 79, ¶¶ 51-52. Singleton informed the officers that Singleton went in the room to investigate "and saw [Plaintiff] on top of Ms. Crimmins beating her." [2] Dkt. No. 62, 57:1-25. Singleton told Plaintiff to stop and Plaintiff complied. Dkt. No. 62, 57:1-25. Plaintiff left the area and went into his bedroom. He "c[a]me back out with a rifle in his hand." Dkt. No. 62, 57:1-25. It was at that point that Crimmins left with her children. Dkt. No. 62, 58:2-4.

Singleton further informed the officers that Plaintiff kept yelling "I wish y'all would just leave me alone." Dkt. No. 62, 58:2-4. Plaintiff "began firing the rifle into the ceiling" and told Singleton he was going to kill himself. Dkt. No. 62, 58:6-9. Singleton stated that Plaintiff then ran out the back door

---

[2] Plaintiff denies that he hit Crimmins or that he took methadone. Dkt. No. 64, 32:5-6, 34:12-18. However, the focus of this description of the facts is what Defendants were told. Thus, whether or not Plaintiff actually hit Crimmins or took methadone is immaterial for present purposes.

of the residence with the rifle, prior to the officers' arrival. Dkt. No. 62, 58:6-9.

Officer Courson "took photographs of the bullet holes and the one shell casing on the floor" of the residence. Dkt. No. 62, 58:13-15. Officer Perkins "observed a total of five holes in the ceiling." Dkt. No. 62, 58:14-15. In light of the circumstances, Officer Perkins "called for K-9 units to come assist [them] with finding [Plaintiff]." Dkt. No. 62, 58:13-16.

Officers Davis and Gourley were called to the scene. Dkt. No. 79, ¶¶ 61-63. It was these officers who eventually tased Plaintiff. Unlike the other defendants, Officer Gourley was not an employee of the Coffee County Sheriff's Department. Dkt. No. 79, ¶¶ 5-6. Officer Goruley was a canine officer with the Georgia Department of Corrections. Officer Gourley had a bloodhound. Dkt. No. 79, ¶ 5. Officer Davis contacted Officer Gourley because "they had a dangerous situation where a subject had fled in the woods with a rifle." Dkt. No. 79, ¶ 63.

Like Officer Perkins, Officer Gourley testified that he encountered Crimmins on his way to the residence and stopped to speak with her by the side of the road. Dkt. No. 79, ¶ 64. Crimmins told Officer Gourley that "she was afraid to go to her house because of what had happened." Dkt. No. 79, ¶ 65.

Upon their arrival, Officer Perkins informed Officers Davis and Gourley of the situation. Officer Perkins testified that he

told them "[e]verything [Plaintiff] had done to [Crimmins], that he ran out the back door with a gun in his hands in the woods, intoxicated, possibly high on methadone." Dkt. No. 79, ¶ 68. Officer Perkins told them "[e]verything that [he] had learned." Dkt. No. 79, ¶ 68. Thus, Officers Davis and Gourley knew that Plaintiff had fired rounds in the house, threatened to kill people, had attacked his fiancée, had a weapon he had already discharged, and possibly also had a knife. Dkt. No. 79, ¶ 69. Officer Perkins instructed the officers to wear bulletproof vests, which was not the norm for tracking a suspect. Dkt. No. 79, ¶ 70.

All four officers set off into the woods in search of Plaintiff. Officer Gourley, with his bloodhound, led the search. Dkt. No. 79, ¶ 73. Defendants used flashlights to guide their path because of the late hour. Dkt. No. 79, ¶ 72.

When Plaintiff observed sirens and police vehicles arriving at the residence, Plaintiff climbed up into a tree. Dkt. No. 81, ¶ 18. On his way up, Plaintiff left the gun in a crook of the tree below him. Dkt. No. 64, 85:7-14. The dog led Defendants near the tree where Plaintiff was. Dkt. No. 79, ¶ 75. Almost everyone who was there has a different account of precisely what happened from this point forward. However, according to the summary judgment standard, this description

AO 72A
(Rev. 8/82)

views the facts in the light most favorable to Plaintiff and credits his testimony.

According to Plaintiff, because Defendants had not yet seen him, Plaintiff cried out "Hey, I'm up here." Dkt. No. 79, ¶ 76. Officer Perkins called out to the other officers "He's up in the tree" and Defendants shined their flashlights onto Plaintiff. Dkt. No. 79, ¶¶ 77-78.

Plaintiff's exact position in the tree was discussed at length in the depositions. The Complaint alleged that Plaintiff's feet were "more than four feet off the ground." Dkt. No. 1, ¶ 40. Discovery has produced various estimates of how high Plaintiff was off the ground. Most of these estimates exceed four feet. Dkt. No. 62, 84:21, Dkt. No. 65, 51:20-25. The highest estimate was given by Plaintiff during his deposition. Plaintiff testified that he thought his feet were approximately 11 to 12 feet above the ground. Dkt. No. 64, 117:13-21.

The position of the rifle in the tree is also disputed. According to Harper, the rifle was out of his reach but was within reach of Officer Perkins. Dkt. No. 64, 115:1-2. Defendants have themselves given internally conflicting accounts of where the rifle was located. During their depositions, Officers Gourley and Davis testified that Harper was actually holding the rifle in his hands. Dkt. No. 63, 40:18-25; Dkt. No.

65, 27:16-25, 28:21-25.  However, the reports filed by Officers Gourley and Davis following the incident did not mention that Harper was holding the rifle.  See Dkt. Nos. 65, 66.  At this juncture, the Court does not need to discern which defense version should be credited.  Rather, at the summary judgment phase, the Court construes the facts in the light most favorable to the non-movant.  For the purposes of this motion, the Court will accept Harper's version and assume that the rifle was not immediately accessible to Harper and, instead, was accessible to law enforcement.

All the officers started commanding Plaintiff to show his hands and to come down out of the tree.  Dkt. No. 64, 84:1-3. According to Plaintiff, he already had his hands out and stated to Defendants "My hands is out [sic]."  Dkt. No. 64, 84:5-8. Defendants however continued to yell for Plaintiff to both show his hands and come down out of the tree, even though coming down from the tree would require the use of Plaintiff's hands.  Dkt. No. 64, 84:5-8.  Plaintiff testified that, with his hands showing, he "kept hollering '[m]y hands is out' [sic.]" and said "I can't do both.  My hands is out [sic.]."  Dkt. No. 64, 84:9-17.  Plaintiff testified that he said "I surrender.  I give up." Dkt. No. 64, 103:14-15.

After showing his hands, informing Defendants that his hands were out, and asking for further instructions, Plaintiff

AO 72A
(Rev. 8/82)

told Officer Perkins about the gun in the tree. Dkt. No. 64, 85:7-14. Officer Perkins "said 'Do what?'" and Plaintiff said "There's a gun down there at the tree." Dkt. No. 64, 85:9-12. Officer Perkins then moved his flashlight off Plaintiff and down the tree. Dkt. No. 64, 85:11-14. Officer Perkins saw the gun and then shined his flashlight back on Plaintiff and stated "'He's got the fucking gun up in the tree with him.'" Dkt. No. 64, 85:13-14.

Officer Gourley deployed his taser, however the taser either malfunctioned or did not establish a good connection. Dkt. No. 79, ¶¶ 83-84. Plaintiff fell back against the trunk of the tree and began slapping the taser wires. Dkt. No. 79, ¶ 85. Defendants continued to command Plaintiff to show his hands and come down out of the tree. Officer Davis deployed his taser, which functioned properly. Dkt. No. 63, 82:17-25. On impact, Plaintiff fell out of the tree. Dkt. No. 79, ¶ 88. Unable to break his fall, Plaintiff fell headfirst onto his shoulder. Dkt. No. 66, 77:4-9. The impact left Plaintiff paralyzed.

The entire incident happened extremely fast. Plaintiff estimated that from when he first saw Defendants coming into the woods till the time he was tased was "maybe a minute." Dkt. No. 64, 93:10-11. From the time Plaintiff informed Defendants of his location up in the tree until the time he was tased was a matter of seconds. Dkt. No. 64, 93:23, 94:1.

Previously in this case, all Defendants filed motions to dismiss.  Dkt. Nos. 14, 16.  This Court granted those motions in part, but denied those motions as to the § 1983 claims as to all Defendants and for the state law claims against Officers Perkins, Courson, and Davis.  Dkt. No. 33.  Defendants appealed. Dkt. No. 46.  The Eleventh Circuit affirmed the denial of qualified immunity.  Dkt. No. 46; Harper v. Perkins, 459 F. App'x 822 (11th Cir. 2012).

Defendants now move for summary judgment on all remaining claims.  See Dkt. Nos. 67, 72.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The court must view the evidence and draw all inferences in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  To discharge this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.  The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative

AO 72A
(Rev. 8/82)

evidence to show that a genuine issue of fact does exist.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## DISCUSSION

## I. Excessive Force

Viewing the facts in the light most favorable to Plaintiff, summary judgment is not appropriate for Officers Gourley and Davis, the officers who actually tased Plaintiff. However, for Officers Courson and Perkins, summary judgment is warranted.

### A. Officers Gourley and Davis

Discovery uncovered some evidence favorable to Officers Gourley and Davis; however that is counterbalanced by other conflicting evidence that weighs in Plaintiff's favor. Under Plaintiff's version of the facts (which varies greatly from Defendants' versions), Officers Gourley and Davis violated Plaintiff's Fourth Amendment rights by using excessive force against a compliant and nonthreatening suspect.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension." Harper, 459 F. App'x at 825. The standard for assessing whether the level of force in a particular case is excessive "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to

their underlying intent or motivation." Graham v. Connor, 490

U.S. 386, 397 (1989).

This inquiry is based on the totality of the circumstances.

However three factors guide whether a particular use of force is

unreasonable. The quantum of force employed is measured against

(1) the severity of the crime at issue, (2) whether the suspect

posed an immediate threat to the safety of the officers or

others, and (3) whether the suspect actively resisted arrest or

attempted to evade arrest by flight. Lee v. Ferraro, 284 F.3d

1188, 1197-98 (11th Cir. 2002). The officers actions are viewed

"from the perspective of a reasonable officer on the scene,

rather than through the lens of hindsight." Kesinger ex rel.

Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir.

2004). "The calculus of reasonableness must embody allowance

for the fact that police officers are often forced to make

split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that

is necessary in a particular situation." Graham, 409 U.S. at

396-97.

The amount of force employed by Officers Gourley and Davis

was substantial. At the motion to dismiss stage, the Eleventh

Circuit rejected Defendants' arguments that a taser constitutes

a moderate, non-lethal level of force and found the use of a

taser against an individual "at least four feet off the ground"

was "substantial." Harper, 459 F. App'x at 827. Shoving someone while they are standing on the ground may be minimal force. Yet, if that exact same shove is employed against someone on a ladder or standing on the edge of a roof, there is considerably more risk. Likewise, tasing someone in a tree with his feet up to twelve feet off the ground is far more serious than tasing someone on the ground. Plaintiff was in a precarious position as further evidenced by the fact that his fall has left him a paraplegic.

## 1. Severity of the Crime at Issue

After discovery, it is clear that Defendants were called to the scene as a result of serious offenses committed by Plaintiff. In considering the case at the dismissal stage, the Eleventh Circuit noted that it had "little basis to assess" the severity of the crime at issue because all the Complaint stated was that Defendants were called as a result of Plaintiff's "intoxicated behavior." Id. at 826. Discovery, however, has brought many more details to light. This factor weighs in favor of Officers Gourley and Davis's use of force. Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2009) ("Generally, 'more force is appropriate for a more serious offense and less force is appropriate for a less serious one.'"). Plaintiff had been involved in a physical altercation and, while intoxicated, had

discharged a gun multiple times in an occupied residence.   These
are hardly minor infractions.

## 2. Immediacy of the Threat

Crediting Plaintiff's testimony, as this Court must,
Plaintiff was a minimal threat to law enforcement at the time he
was tased.   Plaintiff testified that he was complying with the
request to show his hands and was asking for further
instructions because it was impossible for him to simultaneously
comply with both commands.   Even with both hands displayed,
Plaintiff may have posed some threat to law enforcement if the
gun is shown to have been within reach.   See Taylor v. Freeman,
447 F. App'x 78, 81 (11th Cir. 2011) (intoxication a factor in
determining threat); Jean-Baptiste v. Guitterez, 672 F.3d 816,
821 (11th Cir. 2010) (even if a suspect does not have his weapon
drawn, the weapon can still be available for use).

At this stage, the exact position of the gun in relation to
where Plaintiff was standing is hotly disputed.   Plaintiff
contends both his hands were raised and empty and that he had
abandoned the gun far enough away that he would have had to move
away from his current perch to access it.   It was not within his
reach but instead was within reach of law enforcement.
Plaintiff testified that when he informed Officer Perkins of the
rifle's location, Officer Perkins "could have stepped there and
grabbed the gun" to eliminate any threat the gun posed.   Dkt.

No. 54, 115:1-2. Officers Gourley and Davis have themselves given differing accounts of the location of the rifle. During their depositions, both officers testified that Harper was holding the rifle. Dkt. No. 63, 40:18-25; Dkt. No. 65, 27:16-25, 28:21-25. However, neither officer included that information in their reports following the incident. All parties agree that the gun remained in the tree after the fall. A jury could find that undisputed fact supports Plaintiff's version of events rather than Defendants' deposition version that Harper was holding the gun. It does seem unlikely that Harper would have had the ability to place the gun in the tree during his paralyzing fall. Viewing these facts in the light most favorable to Plaintiff, a jury could find the rifle was out of Plaintiff's reach and that this fact was apparent to Officers Gourley and Davis.

Defendants urge that this case is similar to Oakes v. Anderson, where the Eleventh Circuit held that law enforcement used reasonable force in shooting a man in his car who was not suspected of committing any crime. Oakes v. Anderson, 494 F. App'x 35, 40-41 (11th Cir. 2012). That case, however, is readily distinguishable. The decedent in Oakes had "completely ignored repeated demands to show his hands, then jerked suddenly." Id. at 39. Plaintiff, in contrast, contends he was

complying with the officer's demands to the fullest extent possible and had his hands raised and visible when he was tased.

### 3. Resistance to Arrest

This factor also weighs heavily in Plaintiff's favor. According to Plaintiff's testimony, he was making numerous efforts to comply with law enforcement when he was tased. According to Plaintiff, he climbed into the tree to avoid contact with law enforcement, but he did not flee from law enforcement into the woods. As Defendants had been informed, Plaintiff left the house prior to law enforcement's arrival. Dkt. No. 62, 58:6-9. According to Plaintiff, when law enforcement reached his vicinity, he called to them to identify his precise location.

Defendants argue, as they did in their motions to dismiss, that Plaintiff was at least partially non-complaint. Under Plaintiff's version of events, he was being as compliant as he possibly could be. He had complied with what he deemed to be the most important command, to show his hands, he had informed Defendants that it was impossible for him to comply with both commands, and had begged Defendants for information on how he was to proceed. Dkt. No. 64, 84:1-25. Plaintiff and common sense suggest that it is difficult, if not impossible, for someone to both show his hands and climb out of tree branches at the same time. If Defendants had commanded Plaintiff to both

show his hands and levitate, Plaintiff could not be deemed non-compliant for his failure to do so.  Similarly, viewing the facts in the light most favorable to Plaintiff and taking all reasonable inferences in his favor, Plaintiff was as compliant as possible.

Under the facts recounted in Plaintiff's deposition, Plaintiff would pose less of a threat and was even less resistant to arrest than under the facts as alleged in Plaintiff's Complaint and considered in the Eleventh Circuit opinion.  Accordingly, both the second and third factors weigh heavily against Officers Gourley and Davis.  Deploying a taser on Plaintiff under the circumstances constituted excessive force.

This Court is not persuaded by Officer Gourley's argument that he cannot be held liable because it was not his taser deployment that caused Plaintiff to fall since his taser was unsuccessful.  See Dkt. No. 72.  First of all, Officer Davis testified that he deployed his taser immediately following Officer Gourley's taser because of Officer Gourley's failed attempt.  Dkt. No. 63, 82-83.  Secondly, Officer Davis did not violate Plaintiff's Fourth Amendment rights solely because his taser was the immediate cause of Plaintiff's paralysis.

## 4. Qualified Immunity

In assessing the motions to dismiss, the Eleventh Circuit determined that, under the facts as alleged in the Complaint, the illegality of Defendants' actions was clearly established under the "obvious clarity" test. Harper, 459 F. App'x at 827. Qualified immunity offers complete protection for a government official sued in his individual capacity if: (1) the official was 'acting within his discretionary authority,' and (2) his conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Vinyard, 311 F.3d at 1346. In its opinion in this Case on the motions to dismiss, the Eleventh Circuit stated:

> [A]ccepting the complaint's fact as true, we conclude that the Defendants' conduct was unlawful with "obvious clarity": They shot a suspect with a taser gun, which they allegedly knew would incapacitate him, when the suspect (1) was at least four feet up in a tree with his hands raised, (2) posed no threat to their safety or the safety of others, (3) had no chance, and did not attempt, to flee, and (4) merely put his hands in the air in compliance with the instructions of at least one officer.

Harper, 459 F. App'x at 827. In opposition to summary judgment, Plaintiff has now presented evidence that would permit a jury to find all four of those facts to be true. Accordingly, Officers Davis and Gourley are not entitled to qualified immunity because it was clearly established under the "obvious clarity" test that their conduct was unlawful.

Even absent "obvious clarity," case law clearly established that the use of substantial force, under Plaintiff's version of events, as a constitutional violation. Several cases decided prior to May 2008 held that a police officer used excessive force by hitting a suspect who was complying with officer commands and not resisting arrest. Lee, 284 F.3d at 1198 (11th Cir. 2002) (holding police used excessive force in slamming suspect's head down on trunk of car where suspect was already secured in handcuffs and was not attempting to flee or resist); Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000) (holding police used excessive force in severely beating handcuffed individual who did not resist, struggle or attempt to flee); Priester v. City of Riviera Beach, Fla, 208 F.3d 919, 923-25 (11th Cir. 2000) (jury could find excessive force when officers ordered dog to attack suspect who was accused of stealing $20 worth of snacks, stood up in his hiding place, placed hands in air, and complied with officer's first command).

B. Officers Courson and Perkins

Unlike their co-defendants, Officers Courson and Perkins, did not personally tase Plaintiff. Officers Courson and Perkins are entitled to summary judgment. Plaintiff argues that Officers Courson and Perkins are liable for failing to intervene to stop the tasings. Dkt. No. 77 at 10-11.

"An officer can be liable for failing to intervene when another officer uses excessive force." Priester, 208 F.3d at 924. "The liability, however, only arises when the officer is in a position to intervene and fails to do so." Id. Plaintiff admits that "[i]t is likely that Perkins and Courson could not stop Gourley from firing his taser." Dkt. No. 77 at 11. That is an understandable concession by Plaintiff given that, according to Plaintiff, Officer Gourley tasered him within seconds after discovering Plaintiff's location. It is undisputed that no one ordered Officer Gourley to tase Plaintiff and Officer Gourley did so on his own accord. Plaintiff seems to complain that neither Officer Courson nor Perkins affirmatively told the other officers not to use their tasers. However, announcing the precise level of force to use in a suspect's presence would severely undermine police tactics. Thus, this Court holds that Officers Perkins and Courson had no opportunity to intervene prior to Officer Gourley's taser use.

Officers Courson and Perkins also had no opportunity to intervene prior to Officer Davis's deployment of the taser. According to Plaintiff's own testimony, the second taser firing occurred "[i]mmediately" following the first. Dkt. No. 64, 95:23-25, 96:1. "[The] duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part . . . ." Evans v. Stephens, 407 F.3d

AO 72A
(Rev. 8/82)

1272, 1278 (11th Cir. 2005) (en banc). Plaintiff's testimony establishes the lack of opportunity to intervene prior to Officer Davis's taser deployment. Accordingly, summary judgment in favor of Officers Courson and Perkins on the § 1983 claim is appropriate.

## II. State Law Claims

In this Court's prior order, the state law claims against Officer Gourley, a state employee, were dismissed pursuant to the Georgia Torts Claims Act. See Dkt. No. 33. The state law claims against the other Defendants remained pending.

In Georgia, county law enforcement officers are entitled to official immunity for discretionary actions done without willfulness, malice, or corruption. Taylor v. Waldo, 709 S.E.2d 278, 278 (Ga. Ct. App. 2011). Plaintiff has not contested that Defendants' actions in this case were discretionary. To lose the protection of official immunity, a defendant must have acted with "actual malice," which requires a "deliberate intention to do wrong." Phillips v. Hanse, 637 S.E.2d 11, 13 (Ga. 2006).

Discovery has not produced any evidence that any of these three officers acted with a deliberate intention to do wrong. Neither Officer Perkins nor Officer Courson directed anyone to tase Plaintiff. Nor did they personally tase Plaintiff. Undisputedly, Plaintiff did not know or have any interaction with any of the defendants prior to Memorial Day 2008. Dkt. No.

79, ¶ 92.  In his deposition, Plaintiff suggested that, after the fall while Plaintiff was lying on the ground, Officer Perkins made insensitive and unprofessional comments.  Officer Perkins supposedly stated "You're lucky I didn't stomp your fucking head in."  Dkt. No. 64, 196:11-13.  Absent any involvement in the actual tasing, that comment alone is insufficient to allow Plaintiff to proceed on a state law battery claim.

There is also no evidence that Officer Davis, who did tase Plaintiff, acted with a deliberate intention to do wrong.  Officer Davis had never interacted with Plaintiff prior to that night and he did not make any remarks that night from which a jury might infer malice.  Officer Davis tased Plaintiff in response to Officer Gourley's failed attempt.  During the Motions Hearing, Plaintiff argued that a jury could infer deliberate intention to do wrong from the fact that, since that night, Officer Davis has given varying accounts of the incident.  While such evidence might suggest that Officer Davis has attempted post-hoc to justify his actions, that is not evidence relating to whether on Memorial Day 2008, Officer Davis deliberately intended to do wrong and acted with actual malice in tasing Plaintiff.  Accordingly, judgment of a matter of law is appropriate on all of Plaintiff's remaining state law claims.

AO 72A
(Rev. 8/82)

**CONCLUSION**

Based on the foregoing, Defendants' Motions for Summary Judgment, Dkt. Nos. 67, 72, are **GRANTED** in part and **DENIED** in part. Disputed issues of material fact exist as to Plaintiff's § 1983 claim against Officers Gourley and Davis. Summary judgment on those claims is not warranted. However, Officers Courson and Perkins are entitled to summary judgment on the federal claims pending against them. Additionally, judgment is appropriate for Officers Courson, Perkins, and Davis on the remaining state law claims.

     **SO ORDERED**, this 17th day of June, 2013.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA